SPARKS *et al.* v. THE DISPATCH TRANSFER COMPANY,
*Appellant.*

DIVISION TWO.

1. **Corporation:** POWERS OF PRESIDENT: CONTRACTS BY. The president of a corporation being its chief executive officer may, without any special authority from the board of directors, perform all acts of an ordinary nature which by usage or necessity are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business.

2. ———— : ———— : NOTE. The corporation *held* liable in this case on negotiable notes executed in its name by the president for the purchase price of mules.

3. ———— : NEGOTIABLE NOTE : EXTRINSIC EVIDENCE. Where, however, negotiable notes are signed by the president of a corporation in his own name, and nothing appears on the instrument to indicate he was acting as agent of the corporation, extrinsic evidence is inadmissible to show such agency.

4. **Contract:** PERSON USING ANOTHER NAME : ESTOPPEL. A party may bind himself by another than his true name, where he executes an instrument with the intent to so bind himself, or where he uses a name by which he is shown to have held himself out to the world and carried on business.

5. **Practice:** INSTRUCTIONS. Instructions are properly refused when they do not conform to the pleadings and evidence in the case.

*Appeal from Jackson Circuit Court.*—HON. J. H. SLOVER, Judge.

REVERSED.

THIS is an action on five negotiable promissory notes, alleged to have been executed by defendant by and through one Stewart Jackson. The plaintiffs were copartners, engaged in the horse and mule business in Kansas City, and had been for two years prior to the making of the notes sued on. The defendant was a business corporation, organized under the laws of this state, and doing transfer business in Kansas City. On the twenty-first day of June, 1887, one Stewart Jackson,

in payment for certain mules by him bought of plaintiffs that day, gave plaintiffs the following note :

"$1,860.          KANSAS CITY, Mo., June 21, 1887.

"Sixty days after date I promise to pay to the order of Sparks Bros. and Hancock $1,860, for value received, at the banking office of H. S. Mills, in Kansas City, Missouri, with interest from date at the rate of ten per cent. per annum until paid, and, if interest be not paid annually, to become as principal, and bear the same rate of interest.

"Due August 20, 1887.

"DISPATCH TRANSFER CO.

"By S. JACKSON, President."

And on July 5, 1887, said Jackson, in payment of mules that day bought of plaintiffs, gave plaintiffs the following note:

"$1,840.          KANSAS CITY, Mo., July 5, 1887.

"Thirty days after date we promise to pay to the order of Sparks Bros. and Hancock $1,840, for value received, at the banking office of H. S. Mills & Son, in Kansas City, Missouri, with interest from date at the rate of ten per cent. per annum until paid, and, if interest be not paid annually, to become as principal, and bear the same rate of interest.

"Due August 5, 1887.

"DISPATCH TRANSFER CO.

"By S. JACKSON, President.

"Indorsed :   Protest waived.

"S. JACKSON."

On the eleventh of June, 1887, said Jackson, for mules bought by him of plaintiffs, gave them this note :

"$300.          KANSAS CITY, Mo., June 11, 1887.

"Sixty days after date I promise to pay to the order of Sparks Bros. and Hancock $300, with ten-per-cent. interest from date, value received.

"Due August 10, 1887.          S. JACKSON."

On June 11, said Jackson, for mules by him bought that day of plaintiffs, gave this note

"$375.          KANSAS CITY, MO., June 11, 1887.

"Sixty days after date I promise to pay to the order of Sparks Bros. and Hancock $375, with ten-per-cent. interest from date, value received.

"S. JACKSON."

And on June 15, this note:

"$240.          KANSAS CITY, MO., June 15, 1887.

"Sixty days after date I promise to pay to the order of Sparks Bros. and Hancock $240, for one mouse-colored mule bought of C. Sparks, with ten-per-cent. interest from date, value received.

"Due August 14, 1887.          S. JACKSON."

The plaintiffs declare upon each note separately, and charge that the defendant executed all five of the notes, by its president, Stewart Jackson. There is also a sixth count, which is as follows: "*Sixth*. Plaintiffs, for another cause of action, state that between the tenth day of June, 1887, and the sixteenth day of June, 1887, plaintiffs, at the request of defendant, sold and delivered to the defendant certain mules as follows, to-wit: On the eleventh day of June three (3) mules, for $675; on the fifteenth day of June, 1887, one (1) mule, for $240; amounting in all to the sum of $915; which said sum defendant owes plaintiffs, and fails and refuses to pay the same, although payment has been demanded; wherefore plaintiffs demand judgment against defendant for the sum of $915, and for costs."

The defendant, for its defense, denies that it executed either of said notes; denies that it ever authorized the execution of either of said notes; alleges that said notes were given to plaintiffs by said Jackson on his own private account, and that the consideration therefor was certain mules and horses sold by plaintiff to Jackson for his individual account, and in no way connected with defendant's business; that said mules and horses were never delivered to defendant, and were never bought by or for defendant; that Jackson was carrying on a general business buying and selling horses

and mules for his own account, which plaintiffs well knew; and that the horses and mules for which these notes were given were bought by said Jackson in the ordinary course of his business, and plaintiffs knew he did not buy said mules and horses for defendant. Defendant set up its charter, showing that, by it, it was only authorized to conduct a general transfer business in the City of Kansas, moving freight from point to point in said city; that it was never engaged in the business of buying or selling horses or mules, nor authorized anyone to do so for it; that said two notes were wrongfully executed in its name by Jackson; that it had no power to engage in the horse and mule business, and the notes and the trades for said mules were *ultra vires*.

Also, pleaded especially that by one of its by-laws it was provided: "No debt for a sum larger than $500 shall be contracted in behalf of the company by any officer thereof, without a vote of the board of directors authorizing same;" that the debt sued for in the first and second and sixth counts exceeded $500; that said mules were not bought for the defendant by said Jackson in the usual routine of business; that they were not needed by defendant for its business; that they were not desired; that defendant knew nothing of their purchase, and its board of directors never authorized their purchase, nor the contracting of the debt therefor. This answer was verified by Harry E. Overstreet, secretary and treasurer. The reply was a general denial. The cause was tried by a jury, and resulted in favor of plaintiffs on each count except the sixth.

The facts developed by the evidence are as follows: The defendant was a corporation engaged in the transfer business in Kansas City. Stewart Jackson was the president of the company. The company, as originally organized, had a capital of $10,000,—one hundred shares. Jackson had the controlling interest,—fifty-five shares.

Afterwards the stock was increased to $30,000, of which Jackson had one hundred and sixty shares,—a majority of all the stock. Jackson was the president from the beginning until he left in August, 1887, after the execution of the notes sued on. It also appears that Jackson purchased every mule and horse that defendant ever owned until he absconded; that defendant's business required mules to haul the freight it handled; that, beginning with November, 1885, and ending May 31, 1887, defendants had some thirteen different transactions in mules with plaintiffs or the firm which plaintiffs succeeded, aggregating some $3,000; that in a number of these transactions the defendant gave its note in its name, by Jackson who conducted all the trades. There was also evidence that the mules were all turned over to defendant's barns. Defendant offered evidence that it did not get the mules; that, although brought to its barns, they were taken out by Jackson, and shipped to St. Louis; that Jackson bought the mules on his own account, and that plaintiffs knew it. Plaintiffs offered evidence that they thought, and were informed, that the mules were bought by Jackson for the defendant; that when Jackson gave the three notes sued on in counts 3, 4 and 5, they directed him to give the company's notes to the clerk of plaintiffs in their counting-room, and did not know, till after Jackson had absconded, the notes simply bore his name; that they were selling the stock to defendant.

On the trial defendant objected to the introduction of the three notes sued on in the third, fourth and fifth counts, for the reason that they were incompetent, irrelevant and immaterial, as they were the individual notes of S. Jackson alone; that defendant was not and could not be bound thereby. The court gave nine instructions for the plaintiffs, in which the liability of defendant for the acts of Stewart Jackson, done in its name, was correctly defined.

The eighth instruction is as follows: "8. As to those notes here sued on, executed in the name of S. Jackson, the jury will ascertain whether these were executed for and in behalf of the company; and, if you find that they were so executed, then as to these the defendant is liable thereon to the same extent as if said notes had been executed in the name of the company."

For the defendant the court gave twenty-two instructions, fully submitting all the issues tendered in its answer, that the mules were purchased by Jackson on his individual account; that plaintiffs knew it, and whether the purchases were *ultra vires*. The court refused the twenty-third instruction, which is as follows: "23. The jury are further instructed that, even if they should believe from the evidence that at the time of the execution of the notes in controversy, and signed in the name of the defendant company, plaintiffs in good faith believed they were dealing with defendant's company, and yet, while the mules, which in return for said notes they delivered to S. Jackson, remained in his possession, and the plaintiffs knew of their whereabouts before disposed of by said Jackson, plaintiffs or their authorized representatives became aware, or had reason to know, that said Jackson deceived them, and misrepresented to them that said mules were for defendant company, and, notwithstanding such knowledge, made no effort to recover their said mules, but suffered said Jackson to proceed and dispose of the same, then they cannot recover from defendant company; and in determining these questions the jury should determine from the evidence whether said mules were shipped by said S. Jackson to St. Louis, and whether Charlie Sparks was the authorized representative of plaintiffs, and whether he was present at the time of said shipment, or knew of the same in time to have notified plaintiffs and effected a recovery of the mules before they were finally disposed of by said Jackson, if you believe he did dispose of them"

Sparks v. The Dispatch Trans. Co.

The jury returned the following verdict:

"We, the jury, find for the plaintiffs on the first five counts of the petition as follows: First count, principal and interest, $1,937.50; second count, principal and interest, $1,909.49; third count, principal and interest, $313.33⅓; fourth count, principal and interest, $391.66⅔; fifth count, principal and interest, $250.40. We also find for defendant on the sixth count of the petition.          JOHN J. GRANFIELD,

"Foreman."

*Lathrop, Smith & Morrow* for appellant.

(1) The demurrer to the evidence should have been sustained. (2) The defendant corporation had not itself the power to buy the mules for the purposes for which they were bought. R. S. 1879, art. 8, chap. 21; R. S. 1879, sec. 706; R. S. 1889, sec. 2508; 6 Am. & Eng. Corp. Cases, 261. Defendant not having the power to engage in the transaction in question, it could not confer such power on Jackson. *Burtis v. Railroad*, 24 N. Y. 281; *Matthews v. Skinker*, 62 Mo. 333. (3) "An agent authorized to draw or indorse bills in the name of his principal has no power to draw or indorse a bill in his own name, or in the joint name of himself and principal." *Bank v. Gay*, 63 Mo. 38; *Slainback v. Read*, 11 Gratt. 281. "Though the rule of law as to simple contracts in writing other than bills and notes is, that parol evidence is admissible to charge unnamed principals, * * * yet it is conceived that the law as to negotiable instruments is different in one respect, to-wit, that when the principal's name does not appear he is not liable on a bill or note as a party to the instrument." Dicey on Parties to Actions [2 Am. Ed.] pp. 270 and 271; Byles on Bills [8 Ed.] pp. 34 and 35; *Pentz v. Stanton*, 10 Wend. 276; *Leadbitter v. Farrow*, 5 M. & S. 349; *Bult v. Morrell*, 12 A. D. & E. 751; *Bradlee v. Glass Co.*, 16 Pick. 350; *Bank v. Hooper*, 5 Gray, 567;

*Anderson v. Shoup*, 17 Ohio St. 125 ; *Lander v. Castro*, 43 Cal. 497. (4) A note signed A. C., agent, binds A. C. only, though his employers had previously assumed similarly signed notes. *Williams v. Robbins*, 16 Gray, 89 ; *Dubois v. Canal Co.*, 4 Wend. 288 ; *Woodbury v. Blair*, 18 Iowa, 572 ; *Bickford v. Bank*, 42 Ill. 238 ; *Rand v. Hale*, 3 W. Va. 495.

*Peak, Yeager & Ball* for respondents.

(1) Plaintiffs were only chargeable with constructive knowledge of the charter powers of the defendant, which had the authority to purchase stock through its accredited officer and president, who was the head and front of the organization. *Railroad v. Saving Society*, 24 Ind. 461 ; *Bank v. Bank*, 16 N. Y. 125. (2) From the previous course of dealing of defendant with plaintiffs ; from the powers which defendant at all times allowed Jackson to exercise without let or hindrance, and from the powers which he actually possessed to purchase stock for defendant, plaintiffs were warranted in relying upon his representations in selling and delivering the stock in question, and the defendant is bound by those representations. *Bank v. Coal Co.*, 86 Mo. 125 ; *Bank v. Bank*, 7 Atl. Rep. (N. J.) 318 ; *Edwards v. Thomas*, 66 Mo. 468 (486). (3) Plaintiffs were not chargeable with knowledge of any secret criminal purpose on Jackson's part at the time he made these purchases (of which there is no evidence) to steal a part of these mules after they were sold and delivered to defendant ; and if he appropriated part, or all of them, the defendant is nevertheless liable. The defense of *ultra vires* cannot avail. *Lumber Co. v. Bank*, 34 Kan. 635 ; s. c., 10 Am. Corporation Cases, 419 ; *Bank v. Globe Works*, 3 Am. Corp. Cases, 394 ; s. c., 101 Mass. 57. (4) If, therefore, the transactions in question had been the first that ever occurred between the parties, Jackson's authority *virtute officii* (to use the classic

phrase of appellant's brief) would have been ample to bind defendant. *Ins. Co. v. Seminary*, 52 Mo. 480, and cases cited; *Ins. Co. v. White*, 10 Am. Corporation Cases, 191; s. c., 106 Ill. 97.

GANTT, P. J.—The notes sued on in this case were all executed by Stewart Jackson, who was at the time of their execution the president of the defendant below, appellant here. The first two were signed in the name of the Dispatch Transfer Company, by Jackson as president; the other three by Jackson, without any reference to the corporation, or any words indicating that he intended to bind anyone but himself. The appellant seeks to avoid liability for any of these notes, but its defense differs, as to the first two, from its defense to the remaining three. Counsel for appellant argues that the evidence did not justify the instructions given for respondents, by which appellant was held liable on the two notes signed with the corporate name. Those instructions, in substance, declared the law to be that, if the jury should find that Jackson was the president of the defendant, and that defendant allowed him to act as their purchasing agent in buying stock in the name of the company, and recognized his act as such by paying his orders given on the company, or by paying his notes given by him for stock so purchased by him of plaintiffs, then defendant was bound by his acts in purchasing the mules of plaintiffs, and for the notes sued on in the first two counts, unless plaintiffs knew, or had reasonable means of knowing, that Jackson was buying these mules on his individual account.

The power of Jackson to bind the defendant is governed by the law of agency. The principle underlying is the same whether the principal be a corporation or an individual. It is now well settled that, when, in the usual course of the business of a corporation, an officer has been allowed to manage its affairs, his authority to represent the corporation may be implied

from the manner in which he has been permitted by the directors to transact its business.  This is only the application of the principle that usual employment is evidence of the powers of an agent, and the principal is held responsible for the acts of his agent within the apparent authority conferred on the agent.  *First National Bank v. North Missouri, etc., Co.*, 86 Mo. 125; *Washington Mut. Fire Ins. Co. v. Seminary*, 52 Mo. 480; *Kiley v. Forsee*, 57 Mo. 390; *Martin v. Webb*, 110 U. S. 7; *Mining Co. v. Bank*, 104 U. S. 192. The president of a business corporation is its chief executive officer.  He may, without any special authority from the board of directors, perform all acts of an ordinary nature, which, by usage or necessity, are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business.  Boone on Corp., sec. 144; *Stokes v. Pottery Co.*, 46 N. J. L. 237.

In the case at bar Stewart Jackson was president of defendant.  He purchased every mule that defendant owned from its organization until after the execution of the notes sued on in this case.  He had repeatedly signed notes in the name of the corporation, and the corporation had honored his orders and paid his notes so drawn.  Plaintiffs had thirteen different transactions with him as the president and purchasing agent of the defendant prior to the giving of the notes herein, and his acts had always been ratified.  The defendant was engaged in a transfer business in which the motive power was mules, and it was its written charter privilege to buy mules and execute its notes therefor. Jackson had purchased mules for the defendant of the plaintiffs; and on this occasion he informed them he was purchasing the mules, for which these two notes were given, for the defendant.  His transaction, under the evidence, was within both his actual and apparent authority to bind the defendant.  The evidence is amply sufficient to bind defendant on those two notes;

and there was no error in the instructions given for plaintiffs on these two notes, and certainly defendant ought not be to heard to complain.

The action of the court, in admitting parol evidence to show that the defendant was liable on the three notes sued on in third, fourth and fifth counts, notwithstanding its name nowhere appeared on the notes, and in instructing the jury as it did in the eighth instruction for the plaintiffs, presents for our consideration a question of great practical importance, and much depends upon its right decision. The exact question here presented has not been passed on by this court in any case that we have been able to find, but it has been long settled in many of our sister states. In Massachusetts as early as 1814, in the case of *Stackpole v. Arnold*, 11 Mass. 26, it was held that "where one makes a written contract, intending to act therein as the agent of another, and to bind his principal, it is necessary that it should appear in the *contract itself* that he acts as such agent;" and oral testimony was held inadmissible to contradict, vary or materially affect the written contract. The same question came before the same court again in 1863, in *Brown v. Parker*, 7 Allen, 337. In that case one N. H. Streeter had signed two negotiable notes, and it was sought to hold defendant Parker, on the ground that Streeter was his agent, and intended to bind defendant. The court says: "But, in suits on promissory notes or bills of exchange, no evidence is admissible to charge any person as principal *whose name* is not in some way disclosed on the face of the note or draft. This point has been often decided in this commonwealth, and the reasons on which the rule rests have been fully stated in very recent decisions," citing *Slawson v. Looring*, 5 Allen, 340, and cases cited, in which it was said by Chief Justice BIGELOW : "Being negotiable paper, all evidence *dehors* the draft is to be excluded. It is wholly immaterial, therefore, that the defendant was in fact the agent of the company named on the face of the draft ;

that the plaintiff knew that he was so, and that the defendant had no personal interest in the company."

In New York, in *Pentz v. Stanton*, 10 Wend. 271, the cases, both in England and in the different states of the Union, were reviewed, and the conclusion reached "that no person can be considered a party to a bill, unless his name, or the name of the firm of which he is a partner, appear on some part of it," citing Chitty on Bills, 22 ; *Fenn v. Harrison*, 3 T. R. 757 ; *Emly v. Lye*, 15 East. 6. And this rule is universally accepted as the law by the recent text-writers on commercial paper. Tiedeman on Commercial Paper, sec. 87 ; Randolph on Commercial Paper, sec. 131. "The reason of this rule is, that each party who takes a negotiable instrument makes his contracts with the parties who appear on its face to be bound for its payment. It is 'a courier without luggage,' whose countenance is its passport ; and, in suits upon negotiable instruments, no evidence is admissible to charge any person as a principal thereto, unless his name in some way is disclosed upon the instrument itself." 1 Daniel on Negotiable Instruments, sec. 303 ; Mechem on Agency, pp. 285–287 ; *Heaton v. Myers*, 4 Colo. 59. And another good reason for the rule is, that every part of commercial paper must be definite and certain and contained in the body of the paper itself, so that every taker and holder understands exactly what his rights in and to it are, and with whom he is contracting.

Counsel for respondents claim that this doctrine has been repudiated by this court in a number of decisions, and the importance of the question, and the earnestness with which this is urged, demand that we should state our reasons for declining to take that view of the case. The leading case relied upon by respondents is *Washington, etc., Ins. Co. v. Seminary*, 52 Mo. 480. The note which was the basis of the action in that case was as follows :

" $750.

"For value received in policy number 2,969, dated the fourteenth day of March, 1866, issued by the Washington Mutual Fire Insurance Company, of St. Louis, I promise to pay said company (or their secretary for the time being) the sum of $750, in such portions and at such time or times as the directors of said company may, agreeably to their acts of incorporation, require.

"DANIEL MCCARTHY,
"President.
" Per THOMAS BURKE."

This court held that it was competent to explain the ambiguity on the face of the note itself. Speaking for the court, Judge SHERWOOD said in that case : " In the present case, the note sued on is signed ' Daniel McCarthy, President.' But president of what ? Just here, under the rules laid down in the above cases, parol evidence steps in and affords a ready and satisfactory explanation. The word ' president,' attached to the name of Daniel McCarthy, is an earmark of the official capacity in which the note was signed,—not evidence, it is true, that the note was signed in that capacity, but a sufficient basis for the introduction of testimony tending to establish that fact."

Moreover, in that case the note on its face referred to policy number 2,969, which insured the seminary building and church building belonging to St. Mary's Seminary. It will be observed, *first*, that the above note is *not negotiable*, and, *secondly*, that the ambiguity appears on its face, growing out of the word "president," affixed to McCarthy's name. In the case at bar, the notes are, by their terms, *negotiable*, and contain nothing but Jackson's name as maker ; so that this case is not authority, because the facts are entirely different. It is true, however, that, in this case, Judge SHERWOOD quotes from the decision in *Mechanics'*

*Bank of Alexandria v. Bank*, 5 Wheaton, 327, in which the supreme court of the United States says : "It is by no means true, as was contended in argument, that the acts of agents derive their validity from professing on the face of them to have been done in the exercise of their agency." If this were all, it must be conceded that respondents are justified in claiming that this decision is broad enough to permit parol evidence in any case to explain who was the principal, notwithstanding there is no intimation on the face of the paper that any one but the agent is a party to it. But the supreme court of the United States did not put their decision on that ground ; but, on the contrary, Justice JOHNSON, who delivered the opinion, expressly says : "But the fact that this appeared *on its face* to be a private check is by no means to be conceded ; on the contrary, the *appearance* of the *corporate* name of the institution *on the face of the paper* at once leads to the belief that it is a *corporate*, and not an individual, transaction ; to which must be added that the cashier is the drawer, and the teller the payee, and the form of ordinary *checks* deviated from by the substitution of '*to order*' for '*to bearer*.' The *evidence*, therefore, on the *face* of the bill predominates in favor of its being a bank transaction. But it is *enough* for the purposes of a defendant to establish that there *existed* on the face of the paper circumstances from which it might reasonably be inferred that it was either one or the other, and, in such a case, to resort to extrinsic evidence to remove the doubt." So that it seems clear that the supreme court placed its decision upon the fact that, upon the face of the paper the ambiguity appeared. That court would never have held that there was any ambiguity on the face of the notes sued on in the third, fourth and fifth counts in the case at bar. *Falk v. Moebs*, 127 U. S. 597.

In 31 Mo. 193 ( *Smith v. Alexander* ) the action was on the following note :

"$500.                    St. Louis, Mo., July 22, 1855.

"Ninety days after date I promise to pay to the order of Messrs. Smith & Co. $500 for value received, negotiable and payable without defalcation or discount.

"J. H. Alexander,
"Treasurer Ohio & Miss. R. R. Co."

In that case Alexander, having been sued on this note, was allowed to show that he was treasurer of the said railroad, and that he gave the note simply as agent of said company, Judge Ewing saying : "A mere addition to the name of the party signing the contract cannot be regarded as a certain *indicium* that it was made on behalf of another. When, however, it is *doubtful from the face* of the contract whether it was intended to operate as a personal engagement of the party signing it or to impose an obligation on some third person as principal, evidence is admissible to show the character of the transaction." So we see that Judge Ewing places his ruling on the *doubt* appearing on the face of the note, whether it was the obligation of Alexander or the railroad company.

*Shuetze v. Bailey*, 40 Mo. 69, was an action on a contract for half the value of a partition wall. It was not a negotiable instrument at all, and in that case the contract was signed, "Kenneth McKenzie, Agent for Volney Stevenson, on the first part ;" so that case is not similar in any legal feature to the one at bar. In *Musser v. Johnson*, 42 Mo. 74, action was brought on a written assignment of a certain claim against Johnson and others by Isaac H. Sturgeon, President North Missouri Railroad Company, "attested with the seal of the company, and countersigned by Geo. H. Blood, Secretary North Missouri Railroad Company." It was held to be the act of the company. The instrument was not negotiable, and the paper on its face clearly showed it was the intention to assign the railroad company's right.

The next case we are cited to is *Ferris v. Thaw*, 72 Mo. 446. In that case the note or instrument read :

Vol. 104—35

"$4,000.      ·       St. Louis, Mo., October 3, 1870.

"Twelve months after date I promise to pay to the order of John W. Luke, treasurer,. $4,000, without defalcation or discount, for value received, negotiable and payable at the Third National Bank of St. Louis, with ten-per-cent. interest from date, payable semi-annually.                              Charlie Thaw,

        "W. M. Polar Star Lodge, Number 79.

"Indorsed :                              John W. Luke,

                                    "Treasurer."

In that case the defendants were sued as members of Polar Star Lodge number 79 of Ancient Free and Accepted Masons.   Defendant Thaw was its chief officer, with the title of worshipful master.   In that case it was shown that the lodge was an unincorporated body ; that it had borrowed this $4,000 for lodge purposes.   The loan was reported to the lodge and was approved at its meeting, all the defendants voting therefor.   It will be observed that in this case the ambiguity appears on the *face of the paper*, and the court properly permitted evidence to show who were the real principals, and the members of the lodge which received the money were held on it.   It is true the learned judge quotes from Story on Agency and uses language that might be construed to include any undisclosed principal ; but it is not practicable in every case to go over the entire law, and point out all the qualifications that might be mentioned, and, when the law, as quoted, applies to the controlling facts in the case, it must be understood as referring to those facts. It is clear to us that the learned judge who delivered that opinion had no intention of discussing the proposition now under consideration.   The case was placed upon the ground that, the lodge having failed to become a corporation, its members were liable as copartners ; and they were all shown to have ratified the act of the worshipful master, and his agency appeared on the paper itself, so that it was unnecessary to discuss the question as to the liability of a person on an instrument

to which he was not a party.   *Martin v. Fewell*, 79 Mo. 401; *Richardson v. Pitts*, 71 Mo. 128.

It remains only to notice *Franklin Avenue German Saving Institution v. Board of Education*, 75 Mo. 408. That was an action on a school bond, as follows:

"It is hereby certified that the special school district of the town of Roscoe, county of St. Clair, state of Missouri, is indebted to ———, or bearer, in the sum of $500, payable * * *.   This bond is issued under and by virtue of an act of the legislature of Missouri entitled 'An act to authorize cities, towns and villages to organize for schools with special privileges.

                                        "JAS. SMANGER,
"HENRY SWANN,                                 President.
        " Secretary."

Of course, on the face of this bond, it was the bond of the school-district, and no such question as the one at bar was before the court.

In *Snider v. Adams Express Co.*, 77 Mo. 525, Snider was the *consignor* of the lost package, and this court held that, although the package was the property of his sister Louisa, that Snider was the trustee of an express trust, and authorized to sue.   No question of negotiable paper was involved in the case, so that it will appear from an examination of each of the cases relied on by respondents as sustaining the action of the court in admitting parol evidence to show that Jackson was in fact the president and purchasing agent of appellant, and executed the three notes described in third, fourth and fifth counts in behalf of said company, they are all unlike this case, in that in each of them there was some addition, such as "president," "worshipful master," "treasurer," or some title designating an agency on the face of the paper itself, and in such cases the law permits the ambiguity to be explained; and, indeed in all other contracts except bills of exchange and negotiable promissory notes it is always permissible to show by parol

evidence who is the real principal. Tiedeman on Commercial Paper, sec. 87, and authorities cited. But, wherever the cases have been reviewed, we think, it will be found that, although the rule has been relaxed in those cases where the maker or drawer adds the word "agent," or "president" or the like after his name, yet in negotiable instruments, when the principal's name does not appear, he is not liable *on the bill or note as a party to the instrument*. *Devendorf v. Oil Co.*, 17 W. Va. 135; *Fuller v. Hooper*, 3 Gray, 341; *Williams v. Robbins*, 16 Gray, 77; *Pease v. Pease*, 35 Conn. 131; *Keck v. Brewing Co.*, 22 Mo. App. 187; *Bartlett v. Tucker*, 104 Mass. 339.

What we have here said is not in conflict with another equally well-settled rule, that a party may bind himself by another than his true name, where he signs any instrument with intent to bind himself, or signs any name under which he is shown to have held himself out to the world and carried on business. In these cases he is as much liable as if he had signed his true name. *Bartlett v. Tucker*, 104 Mass. 339.

With this view of the law, then, we hold the court erred in the admission of parol evidence to show that Jackson executed the three notes sued on in third, fourth and fifth counts, and in giving instruction, numbered 8, as prayed by plaintiffs. In regard to the refusal to give the twenty-third instruction asked by defendant we think the court committed no error. We do not think any such issue was properly tendered the plaintiffs, nor do we think there was sufficient evidence to justify it, if properly pleaded. We are driven by our views of the law to affirm the judgment of the circuit court on the first and second counts, and reverse the judgment on the third, fourth and fifth counts. *Hunt v. Railroad*, 89 Mo. 607, and cases cited. All the judges of division number 2 concur.